IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Gregory Wayne Keefer, | ) | C/A No.: 1:11-2684-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Cameron McGowan Currie's November 22, 2011, order referring this matter for disposition. [Entry #15]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

## I.     Relevant Background

### A.     Procedural History

On March 22, 2010, Plaintiff filed an application for DIB in which he alleged his disability began on August 10, 2009.  Tr. at 117–18.  His application was denied initially and upon reconsideration.  Tr. at 53, 56.  On March 10, 2011, Plaintiff had a hearing before an Administrative Law Judge ("ALJ").  Tr. at 25–52 (Hr'g Tr.).  The ALJ issued an unfavorable decision on March 21, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 11–20.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 4, 2011.  [Entry #1].

### B.     Plaintiff's Background and Medical History

#### 1.     Background

Plaintiff was 54 years old at the time of the hearing.  Tr. at 117.  He completed the eighth grade.  Tr. at 135.  His past relevant work ("PRW") was as a boiler operator and truck driver.  Tr. at 191.  He alleges he has been unable to work since August 10, 2009.  Tr. at 117.

2.     Medical History

     a.     Records Prior to Plaintiff's Date Last Insured

On January 16, 2008, Plaintiff complained of fatigue to a physician at Doctors Care, where an assessment included fatigue and joint pain. Tr. at 301. Lab results dated January 21, 2008, indicated hypothyroidism, and Plaintiff was started on levothyroxine. Tr. at 292. Notes from follow-up appointments on January 21, 2008, and on February 18, 2008, included diagnoses of hypothyroidism, hyperlipidemia, and depression/anxiety. Tr. at 288, 291. As of May 2008, Plaintiff's prescriptions included levothyroxine, Celexa (for depression), and prevastatin (cholesterol medication). Tr. at 286.

On May 3, 2009, Plaintiff presented to the Roper Hospital Emergency Department with complaints of lower abdominal pain. Tr. at 194. He reported a history of kidney stones, prostatic stones, anxiety, and hemorrhoids. *Id.* Discharge diagnoses included chest pain of unknown cause and epididymitis (inflammation of the organ just behind the testicle; often caused by heavy lifting/exercise). Tr. at 206. He was advised to undergo cardiac stress testing and to have an ultrasound. Tr. at 206–07.

Plaintiff followed up with Dr. Francis Tunney at Patient One on May 5, 2009. Tr. at 218. He was noted to have no known medical problems, but admitted to snoring and daytime fatigue and reported a history of depression. *Id.* On examination, Plaintiff exhibited a normal gait and stance, normal musculoskeletal posture, normal balance, normal mood, and normal memory. Tr. at 220. Dr. Tunney noted that Plaintiff's scrotal pain was of unclear etiology and advised him to follow up with his own physician. *Id.*

b.     Records After Plaintiff's Date Last Insured

Plaintiff initiated care with Dr. David Castellone of Palmetto Primary Care on November 13, 2009.  Tr. at 368.  He reported pain in his hips, legs, and back, and said that his right leg was swollen.  *Id.*  Dr. Castellone diagnosed new anxiety, hypertension, degenerative disc disease, and paresthesias/weakness in the legs.  *Id.*  He also ordered an MRI and nerve conduction study and prescribed Celexa and Lortab.  Tr. at 369.  An MRI of Plaintiff's lumbar spine dated November 19, 2009, revealed mild degenerative facet arthropathy at L5–S1, but no compromise of the exiting L5 nerve root.  Tr. at 222.

Dr. Ruth Hoover conducted a nerve conduction study on November 24, 2009.  Tr. at 365.  She noted that the results were difficult to interpret due to a lot of cramping during the test.  *Id.*  She noted signs of acute (rather than chronic) nerve root irritation at S1 bilaterally.  *Id.*  Dr. Hoover opined that Plaintiff's description of his pain was a bit confusing in that it seemed variable.  *Id.*  She stated that the MRI was not impressive, but that she was "impressed by the clinical picture and the appearance of S1 irritation despite the MRI."  *Id.*  She ultimately noted that the nerve conduction studies were within normal limits, but that some of Plaintiff's muscles showed moderately increased spontaneous activity.  *Id.*

Plaintiff returned to Dr. Castellone on December 1, 2009, with constipation, back pain, depression, and anxiety.  Tr. at 359.  Plaintiff described his back pain, depression, and anxiety as severe.  *Id.*  Dr. Castellone diagnosed Plaintiff with worsening degenerative disc disease and worsening radiculopathy, as well as stable anxiety and hypertension.  Tr. at 361.  He referred Plaintiff to a pain clinic and gastroenterologist.  *Id.*

Plaintiff presented to Summar C. Phillips, M.D., of Pain Care Physicians of Charleston ("Pain Care") on December 3, 2009, with lower back pain. Tr. at 225. He reported pain in his lower back that had begun years earlier. *Id.* He stated that pain radiated into his hips, buttocks, legs, and feet bilaterally and was sustained at 5–6 out of a 10-point scale most days, but was worse in the evening and was sometimes associated with weakness, tingling, and numbness. *Id.* He stated that Lortab worked best to alleviate his pain, but that it only "takes the edge off." *Id.* Plaintiff stated that his daily activities included working as a truck driver and general house maintenance, but said that he was unable to perform those tasks without pain. *Id.* Dr. Phillips administered an epidural steroid injection at L5–S1. Tr. at 226. Following the injection, Plaintiff reported that his pain was reduced from a 6–7 out of a 10-point scale to a 4. *Id.*

Plaintiff underwent nuclear stress testing on December 8, 2009. Tr. at 305. He was found to have fair exercise tolerance. *Id.* The treating physician noted a mild defect, but otherwise normal results. *Id.*

Plaintiff returned to Dr. Phillips at Pain Care again on December 23, 2009. Tr. at 229. He reported that his response to the prior injection was "real good" for two weeks, but that he still had weakness and that his pain gradually started to come back. *Id.* He stated that his pain was at a 5 on a 10-point scale. *Id.* Dr. Phillips administered another epidural steroid injection at L5–S1, which had an immediate effect of reducing the pain to 2. Tr. at 230, 231.

Plaintiff underwent an MRI on December 31, 2009. Tr. at 307. It revealed mostly mild diffuse spondylosis and the disc osteophyte complex at C6–7 that extended

intraforaminally on both sides and could contact the exiting C7 (nerve roots). *Id.* The MRI also demonstrated a focal central superior and inferior extrusion, causing moderate central stenosis and mild anterior cord flattening. *Id.*

On January 6, 2010, Plaintiff reported to Dr. Phillips that the last lumbar epidural injection performed two weeks earlier had not provided any relief, and he had been taking Lortab and Flexeril daily ever since. Tr. at 233. The doctor noted that upon further questioning, it seemed that Plaintiff's leg pain had improved significantly, but that he had persistent pain in his lower back and buttocks. *Id.* Plaintiff reported that medications helped as long as he sat still and stated that he had been limiting his daily activity to just resting and taking it easy due to the pain. *Id.* On examination, Plaintiff exhibited tenderness in the area of SI joint on the right, tenderness over the sacrum midline and pain upon flexion and extension of the lumbar spine, but demonstrated a full range of motion of the lumbar spine. *Id.* Dr. Phillips diagnosed low back pain, radicular symptoms of the lower limbs, neck pain, cervical radiculopathy, sacroiliitis, and facet arthropathy syndrome. *Id.* The doctor opined that Plaintiff's pain could be caused by either the facet arthropathy shown on the MRI or by SI joint arthropathy. Tr. at 234. Dr. Phillips noted that Plaintiff's leg pain (which had previously prevented him from walking) improved greatly with the two lumbar injections, but he still experienced leg pain in a bilateral S1 pattern when lying flat. *Id.* She further noted that given Plaintiff's good response to lumbar epidural injections, Plaintiff most likely had simple lumbar radiculopathy. *Id.* Dr. Phillips recommended that Plaintiff start Celebrex and undergo another injection in one week. *Id.*

Plaintiff returned to Dr. Phillips on January 13, 2010, complaining of severe pain in his neck for several days. Tr. at 235. The doctor decided to administer a cervical epidural injection, rather than a lumbar epidural injection, but did not complete the injection because Plaintiff began feeling light-headed and dizzy. *Id.* Plaintiff returned the following day, and Dr. Phillips performed a successful cervical epidural injection at C5–6. Tr. at 241.

On January 28, 2010, Plaintiff reported that the cervical epidural injection had helped with the pain and with a lot of the stiffness in his neck, and also some with the radiating pain down the arms. Tr. at 243. Plaintiff complained of pain located in the thoracic area between the shoulder blades and in the low back, and of weakness in his legs. *Id.* On examination, Dr. Phillips found thoracic and lumbar paraspinal tenderness and assessed Plaintiff's progress as "moderate at best." Tr. at 243–44. She noted that Plaintiff would be a great candidate for a spinal cord stimulator. Tr. at 244. She suspected that Plaintiff's upper back pain was muscular in nature and she prescribed the conservative measures of a TENS unit, ice therapy, and lidoderm patches. Tr. at 244.

Plaintiff received another lumbar epidural injection on February 16, 2010. Tr. at 245. On March 9, 2010, Plaintiff reported he had gotten relief from that injection, but stated that all the injections wore off after a while. Tr. at 249. He complained of shooting pain and muscle spasms in his hip, legs, and back. *Id.* He stated that bending or twisting aggravated his pain, but that taking hot baths and taking medication improved it. *Id.* Although still in pain, he agreed that his quality of life had improved with the injections and that he was able to perform his normal activities in less pain. *Id.*

On April 8, 2010, Plaintiff sought an opinion regarding leg weakness, discomfort, and refractory pain from John Plyler, M.D., a neurologist with Charleston Neurology Associates. Tr. at 317. He reported leg weakness and discomfort in his hips and legs, episodic arm jerking, dizziness, and numbness of his feet. *Id.* He stated that he had multiple epidural injections with only a marginal response over time. *Id.* On examination, Plaintiff' had decreased but symmetric reflexes, patchy sensory spots distally, and some spasm in the neck and lumbar muscles. *Id.* Dr. Plyler's impression was chronic neck/back pain, parasthesias and dysthesia, possible myofascial fibromyalgia pain syndrome, tinnitus, anxiety, and depression. Tr. at 317–18. The doctor recommended an electrophysiology evaluation, brain imaging, and baseline labs. Tr. at 318. The nerve study was normal. Tr. at 319–21. An MRI of the thoracic spine showed left central disk protrusion at T9–T10 which effaced the left ventral aspect of the thoracic cord; however, the thoracic cord demonstrated normal signal. Tr. at 316. An MRI of Plaintiff's brain was unremarkable. Tr. at 313, 315.

In a follow-up visit with Dr. Plyler on April 27, 2010, Plaintiff reported discomfort throughout his spine, discomfort and weakness in his legs, and his legs giving out with any physical exercise. Tr. at 313. He stated that he still noticed some tremor and shakes and was continuing to have syncopal and blackout events, which had been going on for about five years. *Id.* Dr. Plyler recommended an additional thyroid panel, a vitamin D supplement, consideration of rheumatological evaluation, sleep evaluation, neurosurgical evaluation for the thoracic disc, and cardiology opinion for etiology of syncope. Tr. at 313–14.

State-agency consultant Olin Hamrick, Jr., Ph.D., completed a Psychiatric Review Technique ("PRT") on June 2, 2010.  Tr. at 251–64.  He found that there was insufficient evidence upon which to make a medical disposition or assess Plaintiff's functional limitations.  *Id.*

On July 29, 2010, Plaintiff reported to Dr. Castellone's office that he had almost passed out, that the left side of his face was swollen, and that he was experiencing memory loss.  Tr. at 357.  On examination, Plaintiff exhibited a decreased range of motion and pain in his extremities.  Tr. at 358.  He was referred for a carotid Doppler flow study.  *Id.*

On August 3, 2010, Plaintiff consulted with Dr. Jason Highsmith, a neurosurgeon. Tr. at 331.  On examination, Dr. Highsmith noted that Plaintiff was in significant pain with motion and that he was "clearly uncomfortable."  *Id.*  Plaintiff exhibited paraspinous tenderness throughout the craniocervical junction as well as in the neck, mid-back, and lower back.  *Id.*  He also had significant pain with palpation of his right hip and "actually winced[d] significantly."  *Id.*  Noting the findings of the thoracic MRI, Dr. Highsmith concluded that there was no focal lesion offering a surgical solution or other pathology of the thoracic spine and recommended the services of a rheumatologist.  Tr. at 332.

Plaintiff returned to Dr. Castellone on August 12, 2010, and characterized his back pain as gnawing and severe.  Tr. at 355.  Plaintiff's memory and dizziness were noted to be better with medication.  *Id.*  Dr. Castellone noted that Plaintiff had "new" fibromyalgia and that his anxiety and hypertension were improving.  Tr. at 356.  The doctor referred Plaintiff to a rheumatologist.  *Id.*

State-agency consultant Lisa Varner completed a PRT on August 25, 2010. Tr. at 266–79. She found that there was insufficient evidence upon which to make a medical disposition or assess Plaintiff's functional limitations. *Id.* She noted that a record from May 2009 showed a diagnosis of depression; however, examination showed orientation, affect, mood, memory, and insight and judgment to be normal. Tr. at 278.

On November 1, 2010, Plaintiff was seen by Dr. Gregory Niemer at Low Country Rheumatology. Tr. at 341. Plaintiff reported daily neck and back pain, which the epidurals and TENS unit had not helped. *Id.* Diagnoses included fibromyalgia with multiple trigger points, and degenerative disc disease of the lumbar and cervical spine. Tr. at 345, 347. Dr. Niemer recommended Plaintiff follow up with pain management for injections. Tr. at 345. Plaintiff was seen again on January 26, 2011. Tr. at 340. He had reported having trouble getting to sleep and that his pain impacted his activities of daily living ("ADLs"). *Id.* Examination demonstrated 16 out of 18 tender points. *Id.* Dr. Niemer diagnosed fibromyalgia, degenerative disc disease, and insomnia. *Id.*

Plaintiff saw Dr. Castellone for an annual examination on February 4, 2011. Tr. at 352. Dr. Castellone noted that his degenerative disc disease and fibromyalgia were worsening and that his anxiety was stable. Tr. at 354. The doctor recommended diet, exercise, and stress management. *Id.*

On February 10, 2011, Plaintiff saw Dr. Barton Sachs of the MUSC Orthopaedics Spine Surgery Center, on referral from Dr. Castellone. Tr. at 386. Plaintiff described total body pain and discomfort and numbness throughout his body in all four extremities. *Id.* He also reported dizzy spells and passing out and stated that they were the reason he

stopped driving a truck one year prior. *Id.* On examination, Plaintiff was in no apparent distress and appeared to have a full range of motion in all four extremities. Tr. at 386–87. Dr. Sachs noted that Plaintiff's x-rays showed some advanced degenerative disc disease at C6–7 with some spurs. Tr. at 387. The x-rays did not indicate any gross encroachment of the spinal canal and Plaintiff did not have any significant areas of tenderness at C7 or gross instability on flexion or extension. *Id.* The radiologist interpreted the x-rays to show no alignment abnormalities and mild degenerative disc disease. Tr. at 392. Dr. Sachs noted that Plaintiff moved well. Tr. at 387. The doctor's impression was that Plaintiff's primary condition was one of diffuse pain associated with dizziness and blackout spells, that the condition was primarily neurologic and not spinal, and that Plaintiff did not require surgical intervention. *Id.* He recommended that Plaintiff follow up with a neurologist. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the March 10, 2011, hearing, Plaintiff stated that he lived with his wife, who was employed. *Id.* He said his cousin moved in with them three months earlier to help take care of him. Tr. at 35.

He testified that he last worked as a self-employed truck driver on August 10, 2009. Tr. at 30. He stated he was an independent driver for approximately one year and, prior to that, worked as a company driver. Tr. at 31. He testified that he was also previously employed as a boiler operator, but left that job because of back, neck, and leg

problems and depression.  Tr. at 32, 34.  He stated that in the last several months before his alleged onset date, he turned down jobs because his back pain rendered him unable to drive.  Tr. at 37.  He testified that his wife went on the road with him for the last six weeks that he worked to try to help and take care of him.  *Id.*  He said she would tell him to pull over if it looked like he was starting to get dizzy or was in substantial pain.  *Id.* He stated that on his last driving trip, he abandoned the load half way because he could not finish the trip.  Tr. at 38.  Plaintiff testified that sitting in his truck became extremely painful during his last few months of work and that he could only push himself to do so for 30 minutes before having to stop.  Tr. at 40.

Plaintiff testified that injections for his neck and back pain provided relief "to a degree."  Tr. at 39.  They made the pain bearable, but not so that he could walk more than 15 or 20 minutes.  Tr. at 39–40.  He stated that he was told that he had so much scar tissue that he was not a candidate for surgery.  Tr. at 41.

Plaintiff testified he spent most of his time lying around the house.  Tr. at 32.  He stated that he tried to walk some because his doctor told him it would help alleviate his arthritis symptoms.  *Id.*  He said would walk around his house, yard or occasionally "down the street a little ways," but stated that he always had to lie down to get pain relief after walking.  Tr. at 32–33.  He stated that his walks lasted 10 to 15 minutes.  Tr. at 36. He estimated that he spent up to half his day lying on the floor.  Tr. at 36.  Plaintiff explained that he would lie on the floor rather than on a couch or sofa because he experienced dizzy spells and was afraid he would fall.  Tr. at 37.  He stated that he could sit in a regular chair for about 10 minutes.  Tr. at 47.  He said he could force himself to sit

longer, as he stated he was doing during the hearing, but that he would "pay for it" when he returned home and would have to take muscle relaxers and lay down. *Id.*

Plaintiff testified that he did not go grocery shopping or other kinds of activities outside of the home. Tr. at 33. He stated that he was unable to perform household chores as he used to, such as cooking, cleaning, vacuuming, and doing laundry. Tr. at 44. He stated that he used to go to church all the time, but no longer went because he could not sit through the service. Tr. at 33. He said that since he stopped driving a truck, he had never left the house by himself because he was scared of passing out from pain. Tr. at 44.

He stated that he took all of his medications as recommended and that they helped alleviate some of his pain, but also caused side effects such as memory loss, insomnia, constipation, and dizziness. Tr. at 42. He said he took Lortab, which prevented him from driving, and which was illegal to take while driving commercially. Tr. at 42–43. Plaintiff stated that if he did not take his mediations, he would pass out. Tr. at 43. He said he was taking medication for depression and that he had issues with depression since his time as a boiler operator. *Id.* He testified that all of the problems that he described during the hearing were consistent with his condition as of his alleged onset date in 2009. Tr. at 47.

Plaintiff sought permission to stand-up part-way through the hearing. Tr. at 43. Although Plaintiff's attorney stated that Plaintiff's wife was available to testify, he subsequently stated that the testimony would basically be corroborative of Plaintiff's testimony and agreed to submit her statement instead. Tr. at 45–46.

13

b.    Vocational Expert Testimony

Vocational Expert ("VE") Adger Brown reviewed the record and testified at the hearing.  Tr. at 48.  The VE categorized Plaintiff's PRW as a boiler operator as medium, skilled work and as a tractor trailer driver as medium, semi-skilled work.  *Id.*  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but had to avoid dangerous machinery, work hazards, and driving.  Tr. at 49.  The VE testified that the hypothetical individual could not perform Plaintiff's PRW.  *Id.*  The ALJ asked whether there was any other work that could accommodate those limitations.  *Id.*  The VE identified the jobs of quality control examiner, product sampler and weigher, and parts packer.  Tr. at 49–50.  The VE stated that these jobs would afford a sit/stand option so long as the hypothetical individual did not change position more frequently than every 30 to 45 minutes.  Tr. at 50.  Upon questioning by Plaintiff's counsel, the VE stated that the inability to focus and maintain concentration at least 20 percent of the time would preclude work.  Tr. at 51–52.

c.    Lay Witness Statements

Plaintiff submitted lay witness statements from his wife, his cousin, a friend, and his former boss.

Plaintiff's wife, Jane Keefer, reported that she struggled with balancing her work as a licensed practical nurse with taking care of her husband.  Tr. at 184.  She stated that he has kept her up several times during the night because of his inability to get relief from pain.  *Id.*  She reported that Plaintiff could not assist with household chores, maintain the cars, or perform household repairs.  *Id.*  She stated that his medication resulted in

14

memory loss, that he was depressed and moody due to pain, and that he could no longer play with his grandchildren or sit long enough to watch television. *Id.*

Plaintiff's cousin, Donna Sykes, stated that she moved into Plaintiff's home to help him with daily activities. Tr. at 174. She stated that even walking to the mailbox could be difficult for him some days and that he had to lie down after taking a short walk. *Id.* She noted that she cooked and shopped for Plaintiff and took him to his doctor's appointments. *Id.*

Plaintiff's friend, Shawn Sandella, reported that he sometimes helped Plaintiff with his yard work, especially if it involved any lifting. Tr. at 177. He noted that he had seen Plaintiff in pain from trying to pick up pine cones in his yard. *Id.*

Plaintiff's former boss, Dennis Hair, reported that Plaintiff had many absences for depression and back problems during the last 10 years that Plaintiff worked for him. Tr. at 393. He stated that Plaintiff ultimately had so many absences that he had to leave his job. *Id.*

2.    The ALJ's Findings

In his March 21, 2011, decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.
2.    The claimant has not engaged in substantial gainful activity during the period from his alleged onset date of August 10, 2009 through his last insured of September 30, 2009 (20 CFR 404.1571 *et seq.*).
3.    Through the date last insured, the claimant had the following severe impairments: cervical and lumbar degenerative disc disease, fibromyalgia, and dizziness (20 CFR 404.1520(c)).
4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).  Light exertional work is described by the Commissioner of the Social Security Administration as requiring lifting and carrying 20 pounds occasionally and 10 pounds frequently as well as an ability to sit, stand, and walk for 6 hours in an 8-hour workday.  The claimant is further limited to work avoiding exposure to work hazards, dangerous machinery, and driving of automotive equipment.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on September 23, 1956 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from August 10, 2009, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(g)).

Tr. at 11–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ erred in determining that Plaintiff's depression and anxiety were not severe impairments;

2)    The ALJ's RFC assessment was improper; and

3) Because Plaintiff should have been found capable of no more than sedentary work, the Medical-Vocational Guidelines direct a finding of disability.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from

---

prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for

the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

     B.     Analysis

          1.     The ALJ Erred in Assessing Plaintiff's RFC

Plaintiff argues that the ALJ's RFC determination is not supported by the record because it did not account for all of Plaintiff's physical and mental impairments. [Entry #21 at 15–21]. Specifically, he argues that the ALJ misinterpreted or mischaracterized the records, improperly discounted his credibility, and failed to adequately consider the lay witness statements. *Id.* The Commissioner contends that the ALJ reasonably interpreted the medical records, correctly assessed Plaintiff's credibility, and properly considered the lay witness testimony. [Entry #22 at 9–14]. The Commissioner further argues that the overriding issue in this case is that Plaintiff failed to meet his burden of showing he had disabling impairments after his disability onset date (August 10, 2009) and before his date last insured (September 30, 2009). *Id.* at 14.

Pursuant to the governing regulations, in assessing a claimant's RFC, the ALJ must consider all medically-determinable impairments, including impairments that are not "severe." 20 C.F.R. § 404.1545. Thus, even if an ALJ finds that an impairment is non-severe, he is still required to consider it in determining the claimant's RFC.

As is discussed in more detail below, the ALJ found Plaintiff's depression and anxiety to be non-severe impairments. Nevertheless, they are documented in the record prior to the date last insured and should have been considered in determining his RFC. In the RFC determination, however, the ALJ noted only that he concurred with the findings of the agency consultants and, after careful review of the entire record, assessed no severe mental impairments. Tr. at 17. The ALJ failed to address whether Plaintiff's mental impairments resulted in any functional limitations. Instead, he specifically omitted those impairments when he stated, "I have considered the combined effects of the claimant's cervical disc disease, lumbar disc disease, fibromyalgia, and dizziness, and determined his capacity is limited to light work, avoiding exposure to work hazards, dangerous machinery, and driving of automotive equipment." Tr. at 17. The ALJ's failure to comply with 20 C.F.R. § 404.1545(a)(2) requires remand for consideration of all of Plaintiff's impairments existing as of the date last insured.

With regard to Plaintiff's physical impairments, the court finds that the ALJ failed to sufficiently identify which of Plaintiff's impairments existed as of his date last insured.[4] Although the ALJ noted that his RFC finding was "as of the date last insured," he did not include any substantive discussion regarding this issue. It would have been reasonable to find that the record evidence did not support the existence of degenerative disc disease or fibromyalgia as of the date last insured. Plaintiff had not complained of neck or back pain in the months leading up to his onset date and had not undergone any

---

[4] Under the Act, Plaintiff bears the burden of showing that he suffered from a severe impairment prior to the expiration of his date last insured. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); *see also Johnson*, 434 F.3d at 655–56 (citing *Henley v. Comm'r of Soc. Sec.*, 58 F.3d 210, 213 (6th Cir. 1995).

treatment for such pain. However, the ALJ did not draw this distinction and instead concluded that Plaintiff suffered from severe impairments of cervical and lumbar degenerative disc disease, fibromyalgia, and dizziness. Tr. at 13. He then found that Plaintiff was capable of light work, but that he should avoid exposure to work hazards, dangerous machinery, and driving of automotive equipment. Tr. at 15.

In finding Plaintiff capable of light work, the ALJ discounted Plaintiff's credibility and subjective complaints regarding his pain. Tr. at 16. The parties argue at length regarding the evidence relied on by the ALJ. Given the decision to remand this case based on the ALJ's failure to adequately consider Plaintiff's mental impairments, it is not necessary for the court to address each piece of evidence cited by the ALJ. Of note, however, is the ALJ's statement that Plaintiff had not sought surgical intervention for his back and neck pain. Tr. at 16. That is untrue. Plaintiff consulted with two surgeons who recommended against surgery. Tr. at 331–32, 386–87. Because it is not clear which records the ALJ found relevant to Plaintiff's functional limitations as of the date last insured, it is also unclear whether this inaccurate statement was significant to the ALJ's ultimate decision.

Plaintiff makes much of the ALJ's statement that Plaintiff admitted that he was able to perform normal activities. [Entry #21 at 17]. The court does not agree with Plaintiff that this statement was a "blatant misrepresentation of the record." *Id.* Whether Plaintiff was performing his normal activates with less pain or not, he admitted that he was "able to perform his normal activities." Tr. at 249. The court finds that in discounting Plaintiff's credibility, the ALJ also appropriately relied on Plaintiff's

conflicting statements regarding his reason for quitting work, his daily activities, and the effectiveness of treatment.  On remand, the ALJ is directed to accurately characterize the record and to comply with SSR 96-7p in assessing Plaintiff's credibility.

Plaintiff also challenges the ALJ's treatment of the lay witness statements, which he contends corroborated his testimony.  Citing to 20 C.F.R. § 404.1513(d)(4), he argues that the ALJ's summary dismissal of the statements as "inconsistent with the evidence as a whole" did not comport with the requirement that he consider evidence from other sources.  [Entry #21 at 19–20].  The Commissioner responds that the ALJ considered the lay witness testimony, but found it was not entitled to any weight because it was not consistent with the record as a whole.  [Entry #22 at 11].

Pursuant to SSR 96-7p, in determining the credibility of a claimant's statements, the ALJ must consider the entire case record, including statements from "other persons about the symptoms and how they affect the individual."  SSR 96-7p.  Other persons may include non-medical sources such as spouses, parents, caregivers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. § 404.1513(d).  These lay witnesses "may provide [statements] about how the symptoms affect [a claimant's] activities of daily living and [his] ability to work. . . ."  20 C.F.R. § 404.1529(a).  The court does not determine here whether the ALJ's treatment of the lay witness statements was insufficient.  However, to ensure compliance with SSR 96-7p, the ALJ is directed on remand to address the four lay witness statements and provide specific reasons for giving them little weight.

Finally, Plaintiff noted that the VE provided incorrect numbers from the Dictionary of Occupational from the jobs he opined that Plaintiff could perform. [Entry #21 at 18, n.8]. The ALJ then cited the incorrect DOT numbers in his decision. Tr. at 20. On remand, if VE testimony is necessary, the ALJ should ensure that the VE's testimony is consistent with the DOT.

For the foregoing reasons, the court remands this case to the ALJ for clarification of which of Plaintiff's impairments existed as of the date last insured and discussion of how those impairments (including depression and anxiety) impacted his functional limitations. If the ALJ concludes on remand that Plaintiff suffered from degenerative disc disease as of the date last insured, then he must provide greater explanation to support his finding that Plaintiff was capable of light work. The court notes that its decision to remand is in no way intended to suggest that the ALJ should award benefits on remand.

2.     The ALJ Did Not Err in Finding Plaintiff's Depression and Anxiety To Be Non-Severe Impairments

Plaintiff also alleges that the ALJ erred in failing to find Plaintiff's alleged impairments of depression and anxiety to be severe. [Entry #21 at 13–15]. The Commissioner contends that the ALJ reasonably concluded that Plaintiff did not have a severe mental impairment. [Entry #22 at 7].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). A severe

impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. § 404.1508. It is the claimant's burden to prove that he suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n. 5 (1987).

In finding that Plaintiff's mental impairments caused no more than minimal limitations on work activities, the ALJ relied on a May 2009 treatment record documenting a diagnosis of depression, but noting a normal mental status examination and that Plaintiff was alert and fully oriented and had a normal affect, mood, memory, insight, and judgment. Tr. at 13. The ALJ further noted that while Plaintiff had been prescribed medications for depression and anxiety, his condition was described as stable in December 2009 and February 2011. *Id.* Later in the decision, in evaluating Plaintiff's RFC, the ALJ also noted that he had considered the findings of the state-agency consultants (whom he noted had found that there was insufficient evidence to make a decision on the claim) and concurred with their findings, but stated that he had assessed no severe mental impairments. Tr. at 17.

While Plaintiff attempts to re-characterize and discredit the evidence upon which the ALJ relies, he fails to identify any evidence prior to the date last insured to demonstrate that his depression and anxiety were severe. The record documents few medical visits prior to the date last insured. One visit is the May 2009 record relied upon by the ALJ at step two that documented a normal mental status examination. Other

visits note that Plaintiff had a history of mental impairments and a corresponding prescription, but do not appear to document their severity or any functional limitations.[5] Plaintiff is required to demonstrate that his impairments are severe, *Bowen*, 482 U.S. at 145 n. 5, and that they were present as of the date last insured. *Johnson*, 434 F.3d at 655–656. Although it is undisputed that Plaintiff was diagnosed with depression and anxiety prior to his onset date and date last insured, he has failed to meet his burden of demonstrating that those impairments were severe.

Plaintiff argues that, in finding his mental impairments to be non-severe, the ALJ erred in relying on the reports of the medical consultants because the consultants did not actually render an opinion. [Entry #23 at 2]. Rather, they noted that they did not have sufficient evidence to render any opinion regarding Plaintiff's mental impairments. *Id.* The undersigned agrees that the consultants rendered no opinion. The ALJ noted this in his opinion, but also stated that he concurred with their findings. Given the lack of findings, it is unclear what the ALJ meant. However, the ALJ did not rely on the consultant reports at step two. He referenced them only in his RFC determination. Therefore, the court concludes that any error by the ALJ in "concur[ing] with" the consultants' findings was harmless because his step two determination was based on other evidence.

For the foregoing reasons, the court finds that substantial evidence supports the ALJ's determination that Plaintiff's depression and anxiety were non-severe impairments as of the date last insured. Because this case is being remanded on other grounds,

---

[5] These records are not wholly legible.

however, the ALJ is directed to more fully explain his findings regarding Plaintiff's severe impairments at step two.

### 3.    A Finding of Disability is Not Directed by the Grids

Plaintiff argues that he is only capable of sedentary work and, consequently, that the Grids direct a finding of disability. [Entry #21 at 12–13]. The ALJ found Plaintiff capable of performing light work. Tr. at 15. Thus, this allegation of error is not applicable to the current findings. In the event the ALJ determines on remand that Plaintiff is capable of only sedentary work, then he may rely on the Grids to support a finding of disability.

### III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 13, 2013                                Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge